seated. Well, welcome everyone to uh to Richmond and the Fourth Circuit this morning. Uh, our first case, the United States versus Mr Cornell and others. Uh, Mr Patrick.  Thank you. May please court. I'm Michael Patrick. I from Chapel Hill. I represented Cornell at the trial of this case and on appeal. I'll be arguing this morning on behalf of the all the defendants on the Commerce Clause issues and also arguing for Mr Cornell on the rule 6 15 witness exclusion issue. Following me, Scott, I mean, Brian Alice, who represents the pellet kill foil, will be arguing the Allen charge coercion issue on behalf of all defendants. And after him, Scott Holmes, who represents Ernesto Wilson, will be arguing the verdict sheet unanimity issue on behalf of all defendants. And then I will be handling the rebuttal on behalf of all this issue involves both jury instructions and the rule 29 motion for judgment of acquittal on behalf of all defendants. We, of course, prior to trial, all the defendants joined in jury instruction requests that asked the court on the Rico enterprise element of the Rico offense to charge the jury that a substantial effect on interstate commerce was required. And then we made rule 29 motions, which were denied, arguing that the court had not or the government had not produced enough evidence of effect on interstate commerce to permit the prosecution to go forward. The court took the position consistent with several courts of appeals that only a minimal effect on interstate commerce was and so charged the jury and I think replied that standard in connection with the rule 29 motions. Our view, as we've argued in our brief, is that because this is a non-commercial enterprise, as alleged in this case, a Rico prosecution can involve all sorts of enterprises. And the interstate commerce element of the statute requires that there be an effect or it affect interstate commerce. The Sixth Circuit, of course, has found in the WACOSH, if that's the correct pronunciation of that decision, a number of years ago, that where the government has brought a Rico prosecution for a non-commercial enterprise, and in that case it was a street gang, like in our case, that the government has to show more than a minimal effect on interstate commerce in order to be within the commerce power of the Constitution. And WACOSH, didn't they rob somebody in their home or something like that? I think there were multiple acts of violence probably. It was a street gang that was, you know, the government alleged in that case it was a violent street gang and if you read the indictment in our case, you know, the government controls the indictment it brings to the grand jury. And in our case, it alleged that the Latin kings in Greensboro were basically a violent street gang that maintained its authority and integrity through violent acts. It did not allege that the enterprise was a commercial enterprise. I mean, you could have, you know, given the breadth that the Supreme Court has allowed Rico cases to be, you could have, you know, it could be a sheriff's office, it could be General Motors, it could be a Rotary Club, it could be many different kinds of enterprises. But in this case, they alleged that it was basically a non-commercial enterprise. But you would also look to the proof, which I'm asked about, even under this WACOSH test, wouldn't you still lose because you've got all these bank fraud cases? I mean, that would have to affect interstate commerce, wouldn't it? You know, there was the check-kiting scheme that was the basis for the bank-kiting, I mean, the bank fraud predicate acts involved like $1,200 or $2,000 over a one-week period of time. Could you speak up a bit, please? Yes, sir. We were told that we shouldn't get too close to the mic, but I'll get closer. The check-kiting scheme involved a one-week period of time that involved about $2,000. Are you saying that's de minimis? Yes, sir. I'm saying that's de minimis. And we're not going to try to argue that under the de minimis standard we could prevail in this case. You know, we think we need to challenge the substantial effect and ask the court to produce that. But there is a kind of a distinction between some of the defendants on that. I think as Scott Holmes will talk about or Ernesto Wilson, the only evidence about his involvement with this RICO, alleged RICO enterprise, was in 2007, which was three or four years prior to the check-kiting scheme in this case. And if that is all that the government can point to and for a nexus with interstate commerce, then he's not involved in any of that in this case. Will he apply it on the conspiracy level or on the individual defendant level? I'm sorry, sir? Do you apply that? Aren't they convicted of conspiracy here? Yes, sir. This is a RICO enterprise conspiracy. But it's hard to imagine how someone could enter into a conspiracy and then leave the scene and then several years later the necessary acts be taken by the enterprise. The case on this is really affected by kind of a quartet of U.S. Supreme Court cases. The Lopez, the Morrison race versus Gonzalez, and then Jones versus United States case. And you know, there's a whole, I guess there's those have engendered multiple ways of looking at it. But the Lopez and Morrison cases against were crimes that involved criminal statutes that did not have an interstate commerce element at all in the criminal statutes. And then, of course, the medical marijuana case and the Gonzalez case also involved, you know, the federal criminal statutes against drug distribution. That does not have an interstate commerce element. The RICO case does. The RICO statute does have an interstate commerce element. And in the Jones case, the Supreme Court taught us that even where a statute like the federal arson statute has interstate commerce element, that you have to look to see if there's a significant enough effect in order to justify prosecution under the Commerce Clause. That was a burning of a residence and the Supreme Court decided that a mere burning of a residence was too far a reach. And the later cases, I think, in different circuits have said you have to have at least a commercial building to be have a valid prosecution under the federal arson statute. Now, the Jones case is like the RICO statute in that it does have an interstate commerce element. And so the government in their brief has contended that really the medical marijuana case is the applicable case for at this point. They also cited the earlier case that occurred after Lopez but before the Jones case out of the Fourth Circuit in the United States v. Gray, which was a Vicar prosecution involving, I think, a murder-for-hire and I believe it was in Baltimore. It was my case? Yes, sir. So how do you distinguish Gray? Okay. That was a case that occurred after Lopez and it occurs before the Jones v. United States case. So your argument is that the Supreme Court cases post-Gray abrogated Gray, that Gray is no longer? No. Gray was a case that involved an enterprise that was dealing in drugs. And that was the background of Gray and that was the enterprise that the murder was done in. But the court said it was a minimal standard. That's right. And I think the Race v. Gonzalez case makes it pretty clear that if you've got like a drug distribution, which is what many courts have called a quintessential commercial activity, that that's going to fall under all of the cases over the many decades that have said that the Federal Commerce Power can reach down into trivial acts. And so I think Jones then teaches us later, after the Gray case is decided, that that is not the appropriate view where you have a non-commercial enterprise, where there's a burning of a... Now this enterprise, you know, the government alleged what this enterprise was and the government's allegations in the indictment, I think they're bound to that, and they alleged that this was a non-commercial enterprise essentially. They mentioned drugs and of course the only predicate act involving drugs, the jury did not find that there were any predicate acts involving drugs in this case. The government had a very small amount of evidence about that and that I think the defense successfully showed that the witnesses were pretty preposterous in what they were saying and the jury found there were no predicate acts involving drugs. So it's, you know, we would assert that it's very clear in this case that this involves a non-commercial enterprise and under the Jones rationale that there has to be more than a minimal effect on interstate commerce. Now, so if we were to agree with you, Mr. Patrick, what's your relief here? Well, if you take a look at all the evidence, I mean the judge applied the minimal effect and I think I'm not here to argue that under that standard we wouldn't, the court, the government wouldn't have survived Rule 29, but I think our argument is that under Rule 29 standard there is not a showing a substantial effect and so there should be a dismissal. However, if the court concluded... Dismissal of what? Dismissal of the entire, all accounts. You say it affects all the counts? Yes. Not just the RICO? That's right because counts two and three depend upon the RICO. The Vicar count clearly does and then the carrying a gun and furtherance of violent crime depends upon the RICO. The underlying charge or the underlying offense that they're talking about there is the RICO. So all of it falls. Now, if the court concluded after looking at the evidence there that a reasonable jury could have expected or might have concluded that there was substantial evidence, I think you remand for a new trial. And how could we not do that? I'm sorry? In other words, I guess I'm looking for help from you to tell me how to discern the difference on this record. I think you probably would have to. I mean, I can't ask the court to read 5,000 pages of transcript and parse that out. I'm willing to do that. But I think there was a trivial amount, but maybe that's a question to pose to the government's counsel. Well, no, I'm asking you, where's the line between substantial and minimal? And how is an appellate court supposed to parse that? Well, clearly the Supreme Court in the Jones case said that there wasn't substantial evidence or substantial effect and that the whole case, I think, got dismissed in that situation. And I don't know that I can answer that question further. I have about a minute left and I need to talk a little bit about the witness exclusion issue as well. We had a witness who the government... Does that apply to everybody or just you? Just me. It only applies to you. It was your witness that was excluded? Yes, sir. And she testified in direct contradiction to Charles Moore. The court and the government took the position that somehow she had been informed by talking to my client. Our position is really there's no evidence to support that conclusion. And then, Your Honor, in the King... Judge King, you wrote the Ryan opinion and there was no attempt... Not the Ryan opinion. The one that was in dissent. Yeah, there was... But I understand... There was no attempt to... What was the rule here? The rule... I can't find the sequestration rule. That you all invoked, or was invoked, except the Rule 615. That's all there was, Your Honor. Rule 615 doesn't say anything about witnesses talking about each other. That's one of our points. It says they got to leave the courtroom. That's right. And there was no evidence that they were in the courtroom. Even if you're right about that, how does that really help you? Because you've got this verdict that has multiple acts that don't have anything to do with what your witness is going to testify about. Your Honor, Charles Moore testified about multiple predicate acts. He testified about an arson. He testified about the check-counting scheme. He testified about a shooting at Smith Holmes, which could have been either a murder, attempted murder, or a conspiracy. So he testified about all those things. What prevented us from arguing to the jury was that if you don't believe him about this, and we already had him contradicted about the arson, if you don't believe him about this, then you shouldn't believe him about anything he's testifying about. So it goes to more than just one predicate act. And so it's just not easy to cap, you know, when you attack a witness credibility, it really kind of covers everything that they're talking about. And that's what we would argue on that point. You say it's reversible error. The government says if it's error, it's harmless. Yes, sir. That's their position. But we think it's much broader than just a single predicate act. And that's why we say it's not harmless. Okay. I think I'm exhausted my time. Thank you very much. You've got some rebuttal time. Yes. Mr. Mr. Ouse? Ouse, Your Honor. Ouse, I'm sorry. Ouse from Durham. Pleasure and an honor. Good to have you here. Thank you, sirs. Your Honor, I'm going to address the issue of the second Allen charge. Your Honors, on Thanksgiving Eve, after approximately a five-week trial, Judge Beatty unwittingly coerced guilty verdict. Now, this is reviewed for abuse of discretion. Abuse of discretion, yes. This would be abuse of discretion I would contend under your honors, decisions, and lightly antillery. Are you challenging the substance of the instruction? No, sir. We are not. If it was permissible, the substance of it is all right. Yes. But you said under these circumstances, it shouldn't have been given. Exactly, Your Honor. Essentially, what we have is when you consider all the circumstances here, it is a case by case. We do not, and we're not asking the court to go with the per se Ninth Circuit rulings in this. But under Burgos, what this circuit has held that we have to look whether that instruction, the second one was coercive. And we contend in this case that it was, Your Honor, because if you consider what happened was this. After basically a five-week trial, we had Mr. Cornell, his brother, my client, Mr. Russell Kilfoyle, and Ernesto Wilson, who there was really no evidence, was in fact a Latin King at the other end of the courtroom being convicted, while the odd thing was we had Randolph Kilfoyle, another one of the brothers, number three. The jury knew he was serving time for the predicate act of an armed robbery of a Walmart, and they even asked about it, yet he was acquitted. Now, basically, why we. Doesn't that sort of work against your coerciveness argument? I know, Your Honor, because I think what happened is this all happened on Thanksgiving Eve. How many defendants did the jury end up acquitting? Three acquitted, three convicted. And quite frankly, when you look at the evidence, all of the evidence in the case, the witnesses, all outside of Mr. Wilson, all of the witnesses said that all these people were Latin King members, and they committed all these various acts at different times that composed of this enterprise. Now, what happened was the jury did hear four. But on the face of the verdict, it appears that it was very discerning. And I respectfully would say not. And this gave individual consideration to each defendant. I would argue no. The reason, Your Honors, is that basically you had, this was the verge of Thanksgiving after four weeks of evidence. Judge Beatty told the jury right from the beginning that I'm controlling what the schedule is going to be Monday through Friday except holidays. I'll let you know if there's any changes. And even told us during a bench conference, which is in the record, that I sure hate to have them come back on Friday. Now, after all the deliberation from a Friday late afternoon until Wednesday, what happened at Wednesday 1130, this is Thanksgiving Eve, all of a sudden the jury, they put a note to the jury, I mean to the judge. We are not even allowed to see the note in which we are told that the jury is having problems coming to a unanimous verdict. However, the note from the jury, which we never saw until after the verdict, basically says we can't come to a verdict as to any defendant, first of all, and they never asked for any guidance. And that's the important keystone here, Your Honor, because in the Seawright case, and I believe it's also the, escaping me right now, but one of the Seawright cases, one of the two cases, that this court has really said you have, the jury has to ask for guidance before you get to a second Allen instruction. And that is what happened in this case. The jury was not asking for guidance in this particular matter. They basically said we can't come to a decision. Now, after that second Allen charge is given over our objection, what then happens within two and a half, two hours and 40 minutes and a lunch break on Thanksgiving Eve, the jury we know by 325 in the afternoon Thanksgiving Eve is doing what? They're filling out the verdict sheets, and Mr. Holmes will be talking a little more about that, but they're asking for guidance how to do that. Now, there was the first Allen charge given on Monday afternoon and then a whole day where nothing happened. And so basically what this comes down to is, I would argue, Your Honors, is that you have a judge who's sitting on the bench, jurors have very high esteem for. Quite frankly, you have in your general instructions to the jury, the judge says you really need to come to a verdict on this. We expect a unanimous verdict. Then we get to the first Allen charge, which was on Monday afternoon. Again, essentially, Judge Beatty saying, please come to a verdict. And then we have this one on Thanksgiving Eve morning saying, please, you got to come to a verdict is essentially what it is. Forget all the language. That's what I would contend. That's what the jury's listening. And that's how they view this. And then they come up with this verdict. And what makes no sense about the verdict is they should have convicted everybody at that point. There was no reason to simply acquit the three Latin kings sitting in the middle. They picked both ends. They convicted those. And that's it. Your Honor, given I have to say. You said the judge, no, those circumstances don't cut against you, but I'm having difficulty understanding why. Well, they don't cut against you. The reason being is this is not you said to Judge King, the content's fine. Yes. So is your submission that the judge should have said, OK, we're going to take a nice long holiday weekend break and you all go home, enjoy your Thanksgiving, come back on Monday? That's fine. Sure. That's what you. That would have been fine with us. Well, I'm saying I would have been fine with you. But in retrospect. Yeah, it's always 2020. But so your argument is that given the abuse of discretion standard, it was an abuse of certainly at that point in the day. I mean, we had plenty of time and it could have been done that way. This was the equivalent of basically a five o'clock verdict on a Friday, which we all hate when we're doing jury trials. And I would submit it's something similar. And that's a coercion. That's why the Ninth Circuit has made that bright line cut, saying that a second Allen charge is impermissible. That the second Allen charge is per se. Per se. Exactly. Erroneous. But you're not asking us to buy into that, are you? No, sir. I'm not asking you to. But I think it also points out that even the Roberts. What's your best Fourth Circuit case on it? Best Fourth Circuit cases are the white and the see right cases, your honors, which basically. Do you read Judge Sobeloff's dissent in Sawyer's? That's not not here. No, I'm not. But he dissented back into Sawyer's case on an Allen charge. He said it shouldn't have been given. I just thought maybe you'd studied on that. He was a very renowned jurist. Yes, sir. But basically, we're just asking that under the case by case analysis. And given the short time, what we have is a mixed verdict. We contend it's not the product of a deliberation. It's just something that had to happen. And I would point out, I can't find any cases out there. It looks like all of the analysis of mixed verdict cases, your honors, happens to be more of a case by case analysis, too. There was no per se rule. I thank you very much for your time. Thank you, sir. Appreciate it. Appreciate your help. Mr. Holmes. May it please the court. Scott Holmes. I'm representing Mr. Wilson. I'll be talking about his motion to dismiss and the unanimous verdict issue. One of the things I'd like to have the court look at very carefully in this case is that the indictment in this case alleged particular overt acts against particular defendants on particular days and alleged that those overt acts were done in furtherance of the conspiracy. That's what the indictment alleges. But at the verdict stage and at the jury instruction stage, they were not instructed and consistent with the indictment. They were instructed that if they could find types of acts and an intention to commit types of acts, that that would be sufficient. And that's led to the risk that jurors, when there are multiple acts of each type of crime, could reach a non-unanimous verdict with respect to each of those predicate acts, even though the government alleged in its indictment particular acts by particular defendants on particular days. Well, you claim they had to find a particular act that they each defended, or that's an alleged overt act? That's right. And I think in a conspiracy, you don't. Well, you have to find that somebody in a conspiracy committed an overt act under the general conspiracy statute. But it's imputed to everybody else. It's a member of the conspiracy. Just they have to. That's correct. What you're saying is not the law. Well, it's not the law. But what the law says is that the government is bound by its indictment. If the government had simply alleged- Were they told they had to find an overt act? The overt act section of the indictment- Were the instructions that they had to have an overt act? No. They weren't told they had to find an overt act? No, they weren't. Because, as the government will point out to you, an indictment- They, in a conspiracy case, the jury has to find an overt act that, alleged or not, doesn't have to be alleged. Right. Just have to find that it was in furtherance of the conspiracy. That's right. And it could be an innocent, otherwise innocent act, like walk across the street. That's absolutely correct. By anybody that's in the conspiracy. That's correct. And the government will show that in a RICO conspiracy, they don't even need that. That they can allege, in a proper indictment, just types of act. But what the government- Some conspiracy statutes, you don't have to have. Like the drug conspiracy statute, you don't need an overt act at all. And you don't need one in a RICO conspiracy, except that the Fifth Amendment and the Sixth Amendment of the Constitution require the government to be bound by its own indictment. In the cases that the government cites, the Neapolitan case and the Gleister case, the Seventh Circuit cases, those cases say that it must be stressed that the government, through its ability to craft indictments, is the master- Well, they have to allege the elements of the offense in the indictment. That's right. And if they're bound by that, they allege the elements of the offense. Well, if the- Conspiracy to violate the RICO statute. That's right. But if they- The rest of it's a particularization. The facts that are alleged are a particularization of the offense. I mean, those are, they aren't elements. Well- You have to start arguing about notice or something. Prejudicial notice if they misallege the facts too much. If you've got variances between the proof and the allegation. Well, at its core, the reason that we get to the problem of the risk of non-unanimous verdicts is because when they alleged predicate acts in furtherance of the conspiracy, then they were bound by what they alleged in the indictment. Even if they set the bar higher than they needed to, they still had to meet that bar in order to convict our clients. And so when they set the bar, not to types of acts, but to particular predicate acts, and then they lowered the bar for themselves by showing just types of acts, that created a risk that jurors, when they went back and looked at what these folks were charged with, could agree on types of acts, but never agree on a particular act. And our client could be found guilty based on facts that were never found by a jury. And so if you look very carefully at the Seventh Circuit cases, the Neapolitan case in particular, relied on by the government, the Seventh Circuit makes the same distinction, that you are bound by the indictment that you bring, even if it is on the outside limit or the inside limit of what the conspiracy statute allows. If you allege overt acts, then you're bound to prove overt acts. If you didn't have to allege overt acts, that doesn't mean that you are no longer bound by your indictment. And when you can instruct folks on a lesser theory, then you are lowering the bar, you're constructively amending the indictment, and you're creating a risk of non-unanimous verdicts. And essentially, that's what we're trying to argue to you, that they must be bound by their indictment. And because their indictment had an overt acts section, because the overt acts were in furtherance of conspiracy, they had to instruct that same language in the verdict sheets and in the jury instructions. And when they didn't do that... Did you propose all those instructions that you argued that they had to instruct folks? We, I objected... Do you think you preserved all this? Yes, sir. I objected at both the verdict stage and at the jury instruction stage, that they must allege the particular predicate acts in the jury instructions and on the verdict, because it will be a non-unanimous verdict. They can agree on all kinds of types of robberies, but no one agree on a particular robbery, and the right to a unanimous verdict and the right to... Did you offer an instruction that comports with what you're arguing now? What I offered was a recommendation that instead of a verdict sheet that said types of acts, that the jury be required to show which particular acts they've agreed on beyond a reasonable doubt. It sounds like the answer is no. There was no written act. That's right. There was no written instruction or verdict. You did not offer an instruction consistent with what you're arguing to us. I objected to the verdict sheet and the jury instruction as written. And with that, it appears my time is up. Thank you both. Thank you very much. Let's see. Now we're going to go to the government. Ms. Ralston. Good morning, your honors. May it please the court. Sonia Ralston for the United States. I'd like to start with the last issue that was raised and then go back to the beginning and end with the Allen charge. On this issue of the constructive amendment that counsel most recently raised, this is a completely new argument that made its debut in this case about three minutes ago. It was never raised at trial. It's not in their brief. It's been waived. And it was not properly preserved. No, it was not. They objected to the jury instructions. And you said it was not even it wasn't raised in the thought today. The idea is not even plain error reviews. That was your that's correct. It's been waived. Anything about the constructive amendment of the indictment or variants of the trial proof from the indictment has been waived. Their brief on appeal addresses only whether as a matter of law, the jury instructions have to include specific overt acts as opposed to types of overt acts. It makes no reference to what was charged in the indictment. None of this idea of being bound by the indictment or the government can work itself into higher proof than is required by law. That's all brand new. Now, on the issue that they raised in their brief, they did object. Judge Beatty instructed them on the elements properly, didn't he? That's correct. The overwhelming consensus of the circuits is that the jury has to be unanimous regarding the types of crimes that the RICO conspiracy is aimed at, but not at specific acts that the conspiracy members agree to commit. And that's the consistent rule in every circuit. There is no dissent. The cases that they cite in their brief are about substantive RICO, which is a different statute from the RICO conspiracy and has different requirements. They cite cases about the continuing criminal enterprise and the drug statute, which, as we explained in our brief, is a different situation because their conspiracy is an element of continuing criminal enterprise, and therefore more has to be proven to make them separate offenses under Blockburger. And so that's not opposite. They've changed their argument because they recognize that the one they made in their brief is futile. Now, moving to the Commerce Clause question. I'd like to point out first that the engaging in commerce activity applies to the conspiracy as a whole, not to each member of the conspiracy. It's a conspiracy. Once you're in, you're in. The second thing I'd like to clarify is that counsel kept saying that the Raich decision about marijuana in California was a drug distribution case. It's decidedly not about distribution. That's the entire point of the case. There was no distribution. It's about homegrown marijuana for personal use that never participates in the market. It never goes out and gets distributed or sold. And that was the entire question in that case. So it's not a distribution case. But most importantly, this idea of whether we aggregate the economic impact of individual actions to determine whether they're substantial only comes into play once we've already rejected the involvement of instrumentalities of commerce, channels of commerce, or people or things that have moved in interstate commerce. And the Raich opinion makes this crystal clear. In this case, unlike in Lopez and Morrison, there is a textual jurisdictional hook. So RICO requires that the enterprise be engaged in or affect interstate commerce. So the idea that Lopez or Morrison have anything to do with this is really beside the point. You know, Congress solved the Lopez problem with the Gun-Free School Zones Act by adding a jurisdictional hook that the gun had to have moved in interstate commerce. It's a very minor requirement. And that's met here both because RICO, as a whole, targets economic activity like extortion and bribery, gambling. But what if the government, what if the indictment misses the target? See, I thought this was sort of an as-applied challenge under the Commerce Clause. I think that's the most charitable way to construe their argument. And, but even under that standard, the evidence here and the indictment here pass muster because it alleges Hobbs Act robbery, it alleges bank fraud, it alleges theft from interstate commerce. At the end of the day, the jury didn't check off theft from interstate commerce, but it did on the others. And the proof at trial dealt with all those things. So we proved up at least three, I think probably five, Hobbs Act robberies. And we know that from the verdict sheet? Well, they checked multiple acts of robbery. See, that's what I'm struggling with. You say we know, but all the jury told us was, as you said, multiple acts of robbery. That's enough, Your Honor. It only requires two. Right, right. I understand. So they checked multiple acts of robbery and multiple acts of bank fraud. That's at least four. So that's double what we needed. And that's enough. But if you look at the trial proof, they're arguing about the sufficiency of the evidence. You look at everything that was presented at trial in the light most favorable to the verdict. Would bank fraud be enough by itself? I think so, Your Honor. So, you know, bank fraud targets an instrumentality of commerce. If all of, if that was the only thing the enterprise did was bank fraud, that's RICO conspiracy. You'd have to have multiple acts. It just couldn't be one act. Not one act of bank fraud. But if you committed bank fraud, you know, in a continuing pattern of activity, that's enough. You know, a continuing pattern of any kind of predicate act is enough. You know, multiple acts of bribery is enough. It doesn't have to be a multidimensional conspiracy to satisfy the statute. But also in this case, if you look at the trial evidence, you know, we have people and things moving in interstate commerce. You know, we have Mr. Cornell traveling to Detroit, traveling to New York to meet with other leaders of the Latin Kings. We have all of these guns that were used in all of these different crimes that were collected by the police, have traveled in interstate commerce. And if you look at Judge Boudin's opinion in the Nascimento case out of the First Circuit, I think he very clearly has kind of a quippy line about, you know, if it's enough to convict someone for possessing the gun that moved in interstate commerce, then it's certainly enough when those same people use those guns to commit further crimes. So when you're using the guns that have traveled in interstate commerce to shoot at people, that's a similar connection to the 922-G. But could Congress federalize every murder committed anywhere if a firearm that had traveled in interstate commerce was the weapon of choice? Given that Congress can criminalize the possession of the firearm that moved in interstate commerce? By certain people. By certain people. But those can be by reference to completely non-economic things like a misdemeanor crime of domestic violence in state court. Mm-hmm. Yes. So Congress could actually, and so there really is a police power in Congress, otherwise known as the Commerce Clause. That the government would have to prove beyond a reasonable doubt in that case that the particular gun that was used actually traveled to interstate commerce. That's the same requirement that we have in the 922 cases. And if it's constitutional. So all these cases that fight over Hobbs Act robberies are really beside the point. Because you don't really need Hobbs Act robberies of a 7-11 if you can show that the gun used to commit the robbery traveled in interstate commerce. Who needs the Hobbs Act? Well, often, Your Honor, we can't recover the gun or there wasn't a gun. Fair enough. What about the bullet? If the bullet traveled, I think that's much harder to prove. Well, you can recover the bullet. Sometimes. They're often destroyed beyond identification. And bullets also can be repackaged and reloaded in a way that. OK. And what you want to say is, Judge Davis, Congress can do a lot of things that Congress hasn't done yet. That's right. And it's not likely to do. That's right. There's a political check on Congress that's not an issue in this case. But, you know, RICO, I think, isn't even close to the line. It's, I think, much further from the line than even the 922G situation, which every court has upheld. And in this case, you know, we have the people and the guns traveling interstate commerce. We have, you know, they carjacked someone and the car had. So, yeah, what do you make of the Sixth Circuit? I think the Sixth Circuit decided before it had the benefit of the Supreme Court's guidance in both Martinez and Raich. So the Sixth Circuit opinion is based on constitutional avoidance. And it says, we have this RICO statute, and it means two different things in two different situations. When there's an economic enterprise, it means anything that minutely touches commerce. When it's a non-economic enterprise, we think it requires more substantial effect. But you would argue, wouldn't you, that even under that test, the defendants lose here? Yes. As a sufficiency matter, yes. As an attack on the jury instructions, the jury instructions said no matter how minimal. So the jury instructions here would not pass. The instructions were sound. They were sound. Under the Sixth Circuit test, they would not pass. But so the Sixth Circuit kind of splits the statute in two to avoid having to decide whether a minimal connection for the non-economic enterprise is constitutional as applied. So they're doing this on constitutional avoidance. The next year, the Supreme Court in Clark versus Martinez says, you can't do that. Statutes mean what statutes say. You have to interpret them one way consistently all the time. And then if constitutional problems arise, you address them. So that essentially takes the floor out from under the Sixth Circuit's opinion. I think today the Sixth Circuit would say, OK, it means no matter how minimal in every case because that's the statutory construction, the Supreme Court has consistently given the phrase affects interstate commerce. And then it would question whether the purely violent street gang in that case where the allegations were only that they had attacked rival gangs, you know, there was no robberies alleged. There were no frauds alleged. There was no, you know, nothing even remotely economic alleged. You know, then they would decide whether it was constitutional as applied to those facts. So I think that's the appropriate way to proceed. And once, so the jury instruction was completely fine. And then their conviction is sufficient under that no matter how minimal standard, I think, as they concede. But even under a more substantial standard, it's sufficient because you have the bank fraud, which is a channel or an instrumentality of commerce. You have these Hobbs Act robberies, which are directly affecting interstate commerce businesses. And there was substantial evidence put on at trial that, you know, the businesses were getting supplies from out of state and that the insurance company was paying its premiums to insurance, you know, main insurers out of state and things like that. That the car that was stolen at gunpoint was manufactured out of state, sold at a dealership that operated interstate commerce. So I think altogether, there was plenty of evidence here. On the issue of the exclusion of the witness, this court's opinion in Rines is fractured. It's what? Fractured. It's fractured? Yes. There are several opinions. Well, there were several opinions, but the error on excluding the witness was not fractured. That's correct. It was eight to two. Yes. It was eight to two. That's not very fractured. Yes, Your Honor. But the grounds on which. Erroneously excluded the witness. Yes, Your Honor. The grounds on which that eight to two holding. Had you ever heard of Rines before you moved to exclude this witness? Before this case? No, Your Honor. But you moved to strike the witness testimony because she talked to somebody. Yes, Your Honor. At that time, you didn't know about Rines. I wasn't the trial attorney in this case, Your Honor. Well, but you're here, the government. Yes, I don't know what they knew, but. Well, then you ought to know what they do because you're the only one we have up here to answer the question. It hadn't been cited in the case or brought up or anything like that. My guess is they didn't know what they were talking about. So. I mean, the Sixth Amendment gives the defendant the right to call witnesses. Yes, Your Honor. And it's a really hazardous situation when the government goes off saying they can't call a witness. I mean, if they have done something improper, and I'm not saying they did here because the Rule 615 doesn't cover it. It can cross-examine the witness. Claim they were coached or something. That's the way you handle that sort of thing. You're going to throw witnesses off for a defendant when the Sixth Amendment provides otherwise. I don't know why prosecutors want to get into that. Respectfully, Your Honor, there's no holding in Rines. There are only four judges who think that 615 only applies to the witnesses being in the courtroom and not applying to one of the parties trying to purposefully evade the rule by getting the testimony to the witness. What does Rule 615 say about witnesses talking to somebody outside the courtroom? It doesn't. It doesn't say a word. Absolutely nothing. It says under Rule 615 that witnesses can leave the courtroom or depart the courtroom, whatever the language is, right? Yes, Your Honor. But it doesn't say a word about them talking to people. It doesn't put a gag order on anybody. And what happened in that case was different than this. There they were trying to apply a gag order to a defense lawyer. It was in the case. You don't have that here. I mean, you could charge lawyers, but you could claim that they ought to understand implicit rules, if there is such a thing, implicit sequestration or gag orders better than witnesses. But Rule 615 doesn't cut it. When you just say Rule 615, now the judge might have discretion to expand on what Rule 615 says. I'm sure they do. But you didn't ask for it here, and the judge didn't do it here. You're better off arguing harmless error. It's absolutely harmless. Well, that's what you're better off arguing about. And somebody ought to have a course down there on trying to exclude witnesses that defendants want to call from criminal trial and read them the Sixth Amendment. I'll take your Honor's opinion, and we'll rest our Ryan's argument in what was made in our brief about the scope of that opinion. But this is absolutely harmless. This witness offered one line of substantive testimony, and there's no reason to believe the jury would have come out any differently when it checked off at least six other predicate acts to sustain the conspiracy where only two were needed. Well, the opposing counsel says that this witness had some connection to most all the acts in some way. Is that accurate? No. He testified most specifically about this revenge shooting at the Smith Homes. And that's the thing that- Is that the attempted murder? Well, so that is not one of the identified acts in the indictment. It possibly is an attempted murder, but there were several other attempted murders proven at trial. And, but even if you exclude, even if you think that like- Well, attempted murder is one of the blanks on the verdict sheet, and they checked off a single act of attempted murder. Is that, is that what that would have applied to? I think the most likely thing that it applied to was the shooting at the Maplewood Apartments where they actually shot somebody. Okay, that's what I'm asking you. Is that the attempted murder that's on the verdict sheet, or do you know? We don't know, Your Honor. But there were several attempted murders about which evidence was presented at trial. But even if you assume that the murder, the attempted murder at Smith Homes is the one that the jury meant when they checked that box and exclude that, there are enough other checked things that the jury would have been compelled to return a guilty verdict. That, and this is the cases from the Seventh and Third Circuits that we've cited in our brief, that when there are sufficient remaining predicate acts, the conviction has to stand. So I'd like to move to the Allen charge. The first thing that I think is important to note is that whatever preference the defendants had for instructing the jury, you know, go home at noon on Wednesday, have a nice Thanksgiving, enjoy your turkey, come back on Monday. They never asked for that. They never asked at all. What is the record on that? In what sense, Your Honor? What was preserved? What was objected to? They say they didn't see the note until later. There was no request to see the note. There was no request to see the note. No, the court said. There was no denial of the defendant. Counsel back there are shaking their heads, but you weren't there, but you're obviously very familiar with the record. From what the record says on page 4452, the court says, you know, I've received a note from the jury. It says that they're stuck. I'm going to bring them in and read an Allen charge. The defendants say, you know, we object. And the court says, I've noted your objection for the record. Bring in the jury. And the jury comes in and he reads the charge. And there, I was just looking at it and I did not see a request to see the note. Later on, there is a motion for the jury notes to be included in the record, which the court granted. And they're in the record. They're in the sealed volume 12. So I didn't see that in the record. But there was absolutely no discussion about what the content of the charge should be. And there's no objection here to the content. And I understand the argument. It is the giving of an Allen charge was error, was an abusive discussion. And that's not an easy argument for me to get my head around. So I think apart from the Ninth Circuit's per se rule. That's correct, Your Honor. When we look at all the facts and circumstances of this case and take the whole thing together, all of the instructions, all of what had happened, there'd been a lot of back and forth. The jury had twice asked to see additional evidence. You know, the court, in the course of responding to those notes, had given little colloquies about like, oh, so you want to see this evidence? That's fine. You know, here's how it's going to go. I'm going to let you go home today. We'll come back on Monday. You'll see the evidence. And then same thing on Monday night. You know, oh, you want to see this evidence? It's fine. It's going to take us some time to get it together. So we'll come back in the morning and we'll have that all ready to go for you. And in the meantime, you know, don't talk to anybody. Don't look at anything. And I remind you that, you know, it's your job to consider everybody's views. And what day did he give? Did he give this on Friday afternoon before the weekend? No. So there are two kind of charges at issue. One comes at the end of the day Monday. And the second one comes at the middle of the day on Wednesday. The day before Thanksgiving. That's correct. For the second. Yes. And the first one was at the end of the day on Monday. Yes, Your Honor. And the Tuesday morning was when they were going to get the evidence that they had requested. That's right. They watched a video in the courtroom. And then they saw they got some additional exhibits on Tuesday morning. And they deliberate all day Tuesday. And they go home. They come back Wednesday morning. They deliberate. Then they send the note that says we're stuck. And that's when the court brings them in for the full Allen charge. In, you know, the jury hadn't deliberated for an unusual amount of time. Deadlock is not required. Or, I'm sorry, a request for guidance is not required. It's enough for the jury to say we're having trouble. And the judge can then say, okay, well, you know, I sat through this trial. It was complicated. It went on for a long time. You've only been thinking about it for two and a half days. I think you could think a little harder. When did deliberations begin, by the way? About 4 p.m. on Friday. 4 p.m. on Friday. For just an hour and a half or so. Yeah. They didn't deliberate on Saturday or Sunday. No. Yes, notably at the jury's request in their note. So Friday afternoon, they send a note that says, you know, we would like to see some evidence. And we'd like to go home and come back on Monday. And the court comes in and says, I understand you wish to stop at this time and begin deliberations again on Monday morning at 9 a.m. The court will allow that to occur. So, you know, the jury made a request and the court said that's fine. So I don't think there's any reason to think that if the jury had made a similar request on Wednesday about we want to keep going, can we come back on Monday, that the court would have said no. You know, the court, I think, was being very reasonable. And, you know, he did say it would be a shame if we had to be here on Friday. But that could be read two ways. That could be it'd be a shame if they're not done and I have to force them to come back. Or it could be, you know, it would really be a shame to make them come in on Friday. So let's just wait till Monday if they're not done. And it's unclear because nobody asked. And if the defendants were so concerned about this being coercive, they could have said something at a time when the judge could have responded to it. Instead, they just made a very simple objection to the giving of an Allen charge at all, which preserves it for review, but didn't do anything to help. That's the question, though. Preserved what? There was an objection, but not a request for anything. Yes. So what's preserved? I think, Your Honor, what's preserved is the district court's decision at all to give the second Allen charge. Did they object to the first one? I think so. So they objected to both of them. They were consistently objecting to Allen charges. Well, actually, I'm not sure if they objected to the first one, because I'm not sure the judge said he was going to give it. The first one happened more. He said it on his own, to respond. Yeah, it was kind of a response. So it's in the, it starts at page 4408, and it starts off, you know, you've sent a request to respect with certain items of evidence. The court will provide those you've asked for. And he lists the things. Did he give you all the proposed instruction and say, does this look all right to you? It doesn't appear. Contents? It doesn't appear that that's what happened from the. Okay, but nobody objected to what he said? Yeah, and so then he's saying, I know it's the time of day, and I'll remind you it's your duty to deliberate. And then he goes on kind of through this modified charge. And then he says, when you've reached a verdict and you're ready to announce it, give it to the security officer. If you have a question or need to review some evidence, here's how you do that. He said all that on Monday. This is Monday afternoon. Yeah. See, a lot of judges include all of that in their general charge. Yeah, and much of this was also in the. In the earlier. In the Friday before you go deliberate. Like, if you have a question. Right, so he gave it to him three times. So I think he's just, well, not the full. Like, you know, you have to. I mean, it says your duty is to deliberate. Was there any difference between the first Allen charge and the second one? Yeah, the second one is longer. And it was a true modified Allen charge. Yeah, it's the full, the full Monty. The second one. The first one is kind of just a. It's like off the cuff remarks more than anything in the context of kind of wrapping up for the day and telling them what's going to go on and how we'll proceed tomorrow. We can ask the opposing counsel when they come up, but my notes don't indicate as to the first charge, which I think looks like to me it was sort of off the cuff. He just started and kept on going that there. Anybody said anything about it? Yeah, because I don't think the court said that he was going to give it. He just probably got everybody a little unawares. And then the second time, you know, the court announces there's this note says, I'm going to give the charge. There's an objection. He brings the jury in and gives the full charge. But, you know, as you were discussing with opposing counsel before the jury's verdict, I think, weighs strongly in favor of finding that they weren't coerced. First, they deliberated for an additional three, three and a half hours after the second charge on Wednesday. And that, in comparison to some other cases where this court has upheld the giving of the charge, that's a substantial amount of time. Also, their verdict, it's split not only between convicting some defendants and acquitting some others, but they, you know, when they're checking off the predicate acts on the form, they don't check everything that was discussed at trial. And as I said, there were several attempted murders and they didn't check multiple acts. They checked one. So I think that that shows that the jury really was thinking hard about what had been proven, what they thought hadn't been proven, and giving each defendant the really individualized consideration that the court. That's correct, Your Honor. And as is the general rule that, you know, jury verdicts don't always make sense to those of us who weren't in the room, but as the Supreme Court's instructed in Powell, we're not allowed to take that into consideration. And the, you know, this case, they say that, like, the jury was confused about the verdict form, but they were confused kind of before this last minute checking off the boxes thing. They had sent out a note previously, I think on Monday, also indicating that they were by conspiracy-wide or defendant by defendant. And both times the court just referred them back to the original instructions, which do indicate that the acts are attributed to the conspiracy as a whole and not to individual defendants. So there's no incongruity with all three verdict sheets being the same, because it's essentially what the instructions told them to do. Unless the court has anything further? Okay. We ask that you affirm. Thank you very much. Now, Mr. Patrick? Yes, sir. You're the rebuttal expert. Yes, sir. On the— Was there any type of an objection raised to the first Allen charge? No, sir. It came out of the blue as far as defense counsel was concerned. We were sitting there thinking the jury was about to go home for the afternoon, and the judge is saying some things. And then he comes out with what sounds like pretty much of a modified Allen charge. And so we're kind of looking at each other afterwards and said, do you hear what I heard he just said? In some districts, judges include what Judge Beatty said on Monday in their general charge. Obviously, districts vary in what judges do, of course, and judges vary— Not in my experience in the Middle District and not my experience with the judge. Plus, he really didn't give us— Judge Beatty does not necessarily inform you that he's gotten notes. The government just said that this note about how to consider the evidence as to the enterprise or not, that didn't come in on Monday. We were told about that note. That was like 35 minutes before they came back with their final verdict. That was a note that the judge said we got a note about how to do it, and then we had a discussion. And it's in the record that the court asked us if we wanted to charge the jury again on that, and we couldn't agree to that. And the court basically told the jury, you're going to have to go with the original instructions. It didn't give them an answer to that. We didn't know about—he did not tell us that there was an actual physical note about the deadlock on the jury at midday on Wednesday. We asked at the end of the trial to see those notes, and the judge denied—this is on the record right before the end of the trial transcript on the day of the jury verdict. He told us no. And then he made them— And is that the practice in the district? No, sir. Most of the judges, if you get a note, they show you the note. They say, what should we do about this? And then we discuss it on the record, and there's something given to the jury after that. He didn't do that. So we don't really know. And most of the judges mark the notes with— To do it otherwise might be a better practice, but what he did is not precluded. It's a matter of discretion again. Yeah, I'm not arguing about exactly that point. The record would certainly be clear if that had happened. On the issue of the witness exclusion, Sarah Lee Gallion, really, as I think Judge King has noted, Rule 16 does not cover this situation. The judge pretty much assumed that there had been some sort of other violation by the witness talking to my client, but there's really no evidence that any substance of the testimony was discussed. In fact, the conclusion that she knew about the testimony could have easily come about through means that were not within the Rule 615 at all. There were court reporters—I mean, there were news reporters in the courtroom with news articles every day. Joint Appendix 4592, there's a— But how is it harmful? How is it prejudicial? You mean— Assuming it was erroneous. Despite the testimony. All right. Mr. Moore, as I indicated, testified about a lot of things. He testified about the Smith Holmes shootings, which could be the attempted murder and murder conspiracy. Testified about the check kiting or the bank fraud. He was one of the main witnesses. Oh, I see. Your point is, if they believe he lied about one thing, then they would have disregarded— Yeah, I mean, we could make the argument, you know, we can't bring in a witness, you know, we can't bring in an impeachment. We can make the argument to the jury, you can't bring an impeachment witness about everything this witness says, but we've been able to bring a witness in who directly contradicts them. So if you don't believe him about that, you shouldn't believe him about anything. So, I mean, the credibility affects more than just one thing. I mean, the jury certainly could pick and choose what they believe about a witness, but credibility of a witness in terms of harmless error analysis, I think, goes to— And the jury actually did hear what she said. And then the judge said— Disregard. Disregard it. Not only said that, but he said, you should disregard it because she is not credible. He didn't just exclude her. I mean, he said, I find that she's basically lying, so you should disregard it. That's what he says on the record when he strikes her testimony. And was there any objection to that statement? We were objecting all along to him excluding the witness, so I don't think we need to— So you didn't object to what he said. You objected to what he did. Yes, sir. I mean, I don't know that— Well, there's a difference, I think. Well, I mean, but I'll move on to— Over time and the commerce argument, I wanted to make a little comment on that, but I know— Well, I think we understand it. Yes, sir. We appreciate it very much. And in particular, I want to, on behalf of the court, thank each of the appellants, counsel, your court appointed, and we appreciate your work. And we couldn't do ours without your work. Thank you. We appreciate it very much. We'll come down and greet counsel and take a short break.
judges: Robert B. King, G. Steven Agee, Andre M. Davis